IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **SERVPRO INDUSTRIES, INC.,** | ) | |
| | ) | |
|     **Plaintiff/Counterclaim Defendant,** | ) | |
| | ) | |
| **v.** | ) | **NO. 3:17-cv-01433** |
| | ) | |
| **TAMMY WOLOSKI, PAUL** | ) | **JUDGE CAMPBELL** |
| **WOLOSKI, and DELTA DAWGS** | ) | **MAGISTRATE JUDGE HOLMES** |
| **CONSTRUCTION CORP. d/b/a** | ) | |
| **SERVPRO OF ROSEMEAD/SOUTH** | ) | |
| **EL MONTE,** | ) | |
| | ) | |
|     **Defendants/Counterclaim Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **RICHARD CONNOR,** | ) | |
| | ) | |
|     **Counterclaim Defendant.** | ) | |

## MEMORANDUM

## I. INTRODUCTION

Pending before the Court are Plaintiff/Counterclaim Defendants' Motion for Summary Judgment (Doc. No. 123), and Defendants' Motion for Summary Judgment (Doc. No. 127). For the reasons set forth below, Plaintiff/Counterclaim Defendants' Motion for Summary Judgment (Doc. No. 123) is **GRANTED** in part, and **DENIED** in part; and Defendants' Motion for Summary Judgment (Doc. No. 127) is **GRANTED** in part, and **DENIED** in part.

Servpro is granted summary judgment on the following claims: (1) Defendants' breach of contract counterclaim based on Servpro's termination of the Franchise Agreement; (2) Servpro's breach of contract claim based on Defendants' alleged breaches of the Franchise Agreement by

(a) failure to de-identify vehicles and equipment; (b) failure to transfer telephone number (626)350-3166; and (c) failure to return materials; (3) Servpro's breach of contract claim based on the Guaranty Agreement; (4) Servpro's breach of contract claim based on the Promissory Note; and (5) Servpro's trademark infringement claim under the Lanham Act. The nature of any requested monetary and/or injunctive relief will be considered in a later proceeding. Servpro and Counterclaim Defendant Connor are granted summary judgment on Defendants' counterclaim based on 42 U.S.C. § 1981.

The following claims by Servpro remain: (1) breach of Section 6.6 of the Franchise Agreement for failure to comply with the non-competition provisions; (2) breach of Section 11.1 of the Franchise Agreement for failure to transfer telephone or facsimile number (626)350-3066, and for failure to discontinue social media usage and electronic advertising; (3) breach of the Franchise Agreement for failure to pay royalties and other fees; and (4) common law trademark infringement.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Servpro Industries, Inc. ("Servpro"), a franchisor of cleaning and damage restoration services, brought this action against Tammy Woloski, Paul Woloski, and Delta Dawgs Construction Company d/b/a Servpro of Rosemead/South El Monte, a former franchisee (hereinafter referred to as "Defendants," unless specifically noted). (Doc. No. 1). Servpro asserted claims for federal statutory trademark infringement; common law trademark infringement; and breach of contract regarding the Franchise License Agreement ("Franchise Agreement"), the Guaranty Agreement, and the Secured Promissory Note. (*Id.*) In turn, Defendants brought several counterclaims against Servpro and one counterclaim against Servpro and Counterclaim Defendant Richard Connor. Through a prior Memorandum and Order (Doc. Nos. 119, 120), the Court

2

dismissed all Defendants' counterclaims except two: a counterclaim against Servpro for breach of the Franchise Agreement in terminating Defendants' franchise; and a counterclaim brought by Ms. Woloski against Servpro and Connor for violation of 42 U.S.C. § 1981.

More specifically, the remaining claims and counterclaims are as follows: (1) Defendants' counterclaim for breach of contract based on Servpro's termination of the Franchise Agreement; (2) Servpro's breach of contract claim based on Defendants' alleged breaches of the Franchise Agreement by (a) failure to de-identify vehicles and equipment; (b) failure to transfer telephone numbers; (c) failure to return materials; (d) failure to comply with non-competition provisions; and (e) failure to pay royalties and other fees; (3) Servpro's breach of contract claim based on the Guaranty Agreement; (4) Servpro's breach of contract claim based on the Secured Promissory Note; (5) Servpro's trademark infringement claim under the Lanham Act; (6) Servpro's common law trademark infringement claim; and (7) Ms. Woloski's counterclaim against Servpro and Connor for violation of 42 U.S.C. § 1981. (Doc. Nos. 1, 83).

Through its Motion, Servpro seeks summary judgment as to Defendants' liability on all claims, and requests a subsequent hearing on remedies. Servpro also requests summary judgment on Defendants' two remaining counterclaims. (Doc. No. 123). Servpro did not discuss, in their initial brief, however, their claims for breach of the Franchise Agreement for failure to comply with the non-competition provisions, and for failure to pay royalties and other fees. Servpro also did not discuss the common law trademark infringement claim. Therefore, summary judgment is denied as to these claims. Through their Motion, Defendants seek summary judgment on Servpro's claims, as well as their own counterclaims. (Doc. No. 128).

The parties have agreed to certain undisputed material facts for purposes of the cross motions for summary judgment, some of which are discussed here and some in connection with

3

particular claims. Servpro is a national franchisor headquartered in Gallatin, Tennessee. (Defendants' Response to Servpro Parties' Statement of Undisputed Material Facts (hereinafter "Defendants' Response to Facts") ¶ 1 (Doc. No. 135)). Servpro, through its franchisees, provides, among other services, water and fire restoration services to homeowners and business owners. (*Id.* ¶ 8). A significant portion of the work provided by the Servpro franchisees is work that comes from clients that have a regional or national footprint, such as insurers, retailers, and property management companies. (*Id.*) These are clients that have properties or insureds in multiple states or even nationwide and that have recurring needs for the restoration and mitigation services provided by Servpro franchisees. (*Id.*)

Tammy Woloski and Paul Woloski, on behalf of Delta Dawgs Construction Corporation, executed a Servpro Franchise Agreement with Servpro on August 28, 2015. (*Id.* ¶ 1). Tammy Woloski and Paul Woloski were co-owners of Delta Dawgs, with 85% and 15% ownership interests, respectively. (*Id.*) Randall Isaacson, Servpro's then-president, dated his signature accepting the Franchise Agreement October 12, 2015, and the Agreement became effective on that date. (*Id.* ¶ 2). The Agreement was amended by a separate letter agreement pertaining to the conversion of Delta Dawgs from an independent company providing restoration and construction services into a Servpro franchise. (*Id.*)

The Woloskis executed the Guaranty Agreement and dated their signatures August 28, 2015. (*Id.* ¶ 3). The Guaranty Agreement states that it is executed individually and on behalf of any business entity in which the Woloskis hold an ownership interest. (*Id.*) The Guaranty was countersigned by Mr. Isaacson, on behalf of Servpro, and became effective on October 12, 2015. (*Id.*) The Woloskis, individually and on behalf of Delta Dawgs, signed a Personal Responsibility Statement with Servpro, and dated their signatures August 28, 2015. (*Id.* ¶ 4). The Personal

4

Responsibility Statement was countersigned by Mr. Isaacson, on behalf of Servpro, and became effective on October 15, 2015. (*Id.*) The Woloskis, individually and on behalf of Delta Dawgs, signed the Security Agreement and dated their signatures August 28, 2015. (*Id.* ¶ 5).

Delta Dawgs is a California corporation with its principal place of business at 9906 Lower Azusa Road, El Monte, California 91731. (*Id.* ¶ 6). Before and after entering into the Franchise Agreement, Delta Dawgs conducted business under the d/b/a "Express Restoration." (*Id.*) Delta Dawgs also conducted business under the d/b/a "SERVPRO of Rosemead/South El Monte." (*Id.*)

Servpro contends that, while Delta Dawgs was operating as a Servpro franchisee, multiple Delta Dawgs' customers and insurance companies that insured Delta Dawgs' customers made complaints to Servpro about Delta Dawgs' business practices. (*Id.* ¶¶ 9-12). Servpro claims that it compiled some of these complaints into what the parties have referred to as the "Complaint File." (*Id.*) As more fully discussed below, Defendants argue the Complaint File is inadmissible hearsay evidence, and deny the complaints are meritorious, but do not appear to dispute Servpro received complaints. (*Id.*)

Kim Cunha, Key Account Sales Manager at Servpro, is responsible for the oversight of major insurance clients that use the services of Servpro's franchisees. (*Id.* ¶ 13). Mr. Cunha's duties include working to ensure that Servpro's franchisees are performing according to the expectations of those paying for their services. (*Id.*) A "key account" in Servpro parlance includes those companies that have recurring needs for remediation services that have a footprint at a regional or national level. (*Id.*) In his role, Mr. Cunha only gets involved in disputes or complaints made by national or key accounts when the complaint is major and has been escalated up to him. (*Id.* ¶ 14). Complaints directly from the field rarely make it to Mr. Cunha. (*Id.* ¶ 15). When large insurance clients contact Servpro with complaints, they are treated as a national account issue. (*Id.*) Those

5

clients provide a consistent source of business for Servpro franchises across the country, and the loss of any of those accounts or clients as a customer of Servpro franchises, or losing their confidence, which reduces the workflow to the Servpro franchise system, would have a system-wide impact and is something Servpro seeks to avoid. (*Id.*)

Complaints by "national" or "key" accounts regarding the defendants were escalated up to Mr. Cunha. (*Id.* ¶ 16). Mr. Cunha first became involved in those complaints in late 2016 when he received a call from State Farm about its dissatisfaction with the defendants. (*Id.* ¶ 17).[1] Upon learning of the complaint, Mr. Cunha contacted the southern California trainer-franchisee to investigate and determine the validity of the complaint. (*Id.* ¶ 18). A determination was made that the charges complained of were not agreed to and were not proper. (*Id.* ¶ 19). As noted above, Defendants dispute the validity of the consumer complaints.

Servpro sent Defendants a Notice of Termination dated November 1, 2017, terminating its franchise relationship with Delta Dawgs. (*Id.* ¶ 21). The decision to terminate was made by Servpro's then-President Randall Isaacson. (*Id.* ¶ 22). The Notice of Termination letter, from Servpro Deputy General Counsel Paul A. Maas, states the basis for termination as follows:

> Section 10.4(c) of the Franchise Agreement authorizes Servpro to terminate the Franchise Agreement with notice and without affording Franchisee the opportunity to cure if Franchisee:
>
> (c) . . . engages in conduct that reflects materially and unfavorable upon OPERATOR and the reputation of the System.
>
> As you are aware, Servpro has received numerous serious complaints over the past two (2) years from at least five (5) different national insurance companies about

---

[1]  Defendants do not dispute these statements are factual, but argue they are inadmissible hearsay. (*Id.* ¶¶ 16, 17). Defendants do not explain, however, how testimony about the "receipt" of complaints, rather than the content of those complaints, constitutes "hearsay" under Federal Rule of Evidence 801(c). Having failed to address that issue, Defendants' objection is overruled for purposes of summary judgment.

6

multiple insurance claims regarding your excessive billing and other unethical and improper business practices in dealing with them and their insureds. The staff of your assigned Directors, Ron and Michelle Hebdon, and other representatives of Servpro have repeatedly communicated the message to you that your personal actions and business operations do not meet industry standards or acceptable business practices. Servpro has emphasized to you the need to treat your customers honorably and honestly by providing quality services to them and addressing any customer concerns in a timely manner.

A copy of a recent letter from an attorney for one of your former customers is attached. The improper conduct described fits the patter of the other complaints against. You.

Our records show that since January 2016, your first work month as a SERVPRO® franchisee, just twenty-two (22) months ago, Servpro has received at least nine (9) detailed complaints from customers and insurance companies regarding your Franchise. That is an average of nearly one (1) formal, written complaint every other month you have been operating your Franchise. The customers and insurance companies who took the initiative to contact Servpro consistently complained of price gouging, excessive amounts of demolition, charging for services not performed and your unprofessional behavior and business practices, including attempted intimidation. These are serious violations of your obligations under your Franchise Agreement.

Experience tells us that only a percentage of dissatisfied customers make the effort to contact Servpro to record their complaints. So, while we have detailed records of at least nine (9) such complaints against you, there are likely many more customers who were left with a profoundly unfavorable opinion of the SERVPRO® System and brand because of you and your employees.

While Servpro has devoted an inordinate amount of its resources to addressing the results of your practices, it is apparent that you have not been honest and forthcoming. You continue to engage in the same business practices. Your actions reflect materially and unfavorably upon your Franchise, the SERVPRO® System and brand, thereby materially damaging relationships and reputation with the public and national insurance companies.

This letter provides you with notice that the Franchise Agreement between Servpro and Franchisee is hereby **terminated** effective **immediately.** The Franchise Agreement is being terminated pursuant to Section 10.4 of the Franchise Agreement due to Franchisee's conduct which has reflected materially and unfavorably upon your business and the reputation of the SERVPRO® System and brand . . .

7

(Doc. No. 126-4, at 54, 55). Defendants deny they acted inappropriately or unethically, as alleged in the letter.

## III. ANALYSIS

### A. <u>The Standards Governing Motions for Summary Judgment</u>

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court has construed Rule 56 to "mandate[] the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v.* Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986).

In considering a motion for summary judgment, a court must draw all reasonable inferences in favor of the nonmoving party. *See, e.g., Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986); *Shreve v. Franklin County, Ohio,* 743 F.3d 126, 132 (6th Cir. 2014). The court does not, however, make credibility determinations, weigh the evidence, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).

In order to defeat the motion, the nonmoving party must provide evidence, beyond the pleadings, upon which a reasonable jury could return a verdict in its favor. *Celotex Corp.*, 477 U.S. at 324; *Shreve,* 743 F.3d at 132. Ultimately, the court is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## B.  Defendants' Counterclaim for Breach of Contract

Defendants have asserted a counterclaim that Servpro breached the Franchise Agreement by terminating their franchise. Servpro contends the termination complied with the provisions of the Franchise Agreement.

As set out in the termination letter quoted above, Servpro relied on the following italicized language from Section 10.4(c) of the Franchise Agreement in terminating Defendants' franchise:

> 10.4    Default With Notice; Without Opportunity to Cure.  OPERATOR shall be deemed to be in default of this Agreement, and FRANCHISOR may, at its option, terminate this Agreement and all rights here under, without affording OPERATOR any opportunity to cure the default, effective immediately upon notice to OPERATOR, as applicable, if OPERATOR or any Owner of OPERATOR:
>
> * * *
>
> (c)  is convicted of or pleads guilty to a felony involving dishonesty or breach of trust, a fraud, any type of assault, a crime involving moral turpitude or any other crime or offense that FRANCHISOR believes is likely to have an adverse effect upon the System, the Marks, the goodwill associated therewith, or FRANCHISOR's interest therein, *or otherwise engages in conduct that reflects materially and unfavorably upon OPERATOR and the reputation of the system.*

(Doc. No. 126-1, at 30).

Servpro argues termination was appropriate under this provision because it received numerous complaints about Defendants' business practices from both customers and insurance companies, and Defendants' responses to the complaints were inadequate. As discussed above, Mr. Cunha received complaints beginning in late 2016 from national or key accounts about Defendants' conduct. Paul Maas, Servpro's Deputy General Counsel and the individual who signed the termination letter, testified that he compiled some of the complaints into a "Complaint File." (Deposition of Paul Maas, at 7, 15 (Doc. No. 126-2); Doc. No. 126-3 (Exhibit 19)).

9

According to Mr. Maas, the file contained 12-15 complaints (*Id.,* at 16, 24, 36, 38, 39), which

primarily involved charging for work that was not performed:

> Q. And what was the general basis for the section 10.4(c) termination?
>
> A. In summary, while Ms. Woloski was a Servpro franchisee, we received serious, numerous, credible complaints about misbehavior, many used, several used the word fraud. And many of them had specific instances of overbilling, billing for work that wasn't performed. And as I looked at the responses from Mr. Woloski, they were not responsive. There was not – my understanding, the record shows that she was asked, talked to, counseled, and just didn't change her behavior. And after two years, that was a tipping point.
>
> Q. Was it a single complaint or a totality of complaint (sic) that resulted in her termination?
>
> A. The totality of very serious complaints, very detailed complaints over a long period of time, perhaps the entire time she was a franchisee. As I mentioned before, I've worked in the field of franchising for quite some time. I have never seen this number, and the seriousness, and the continuation with no change.

(*Id.,* at 124; *see also* 36, 87, 124).).

According to Servpro, the decision to terminate was made by Randall Isaacson, the

President of Servpro. In his Declaration, Mr. Isaacson states:

> 4. The financial success of the Servpro franchise system relies to a significant degree upon clients which have a regional or national footprint, such as insurers, retailers, and property management companies. These are clients with properties or insureds in multiple states or even nationwide and which have recurring events requiring the restoration and mitigation services which are provided by Servpro franchisees.
>
> 5. Servpro's franchise system would be far less successful without jobs provided by these clients which have a regional or national footprint. Some of these clients participate in Servpro's national accounts program.
>
> 6. Servpro occasionally, but not frequently, has received complaints from individual property owners about business practices or work performed by a franchisee. Based upon our experience, complaints from homeowners are often directed to the franchise itself, as it is an independent contractor, rather than to Servpro corporate. On occasion, Servpro will receive a complaint about the business practices or work performed by a particular franchisee from a key account

10

or from a client which participates in the national account program, such as a national insurance company.

7. Servpro is always concerned when it receives complaints, but particularly so when it involves a complaint from a key account or from a client which participates in the national accounts program. Losing one of those accounts or clients as a customer of Servpro franchisees, or losing their confidence which reduces the workflow to the Servpro franchise system, is something Servpro takes very seriously and seeks to avoid.

8. Servpro received numerous complaints about the Defendants' business practices during 2016 and 2017 from individual customers of the Defendants, as well as participants in the national account program. These included complaints of fraud, over pricing, over scoping, charging for unnecessary equipment or unnecessary work, etc.

9. These complaints culminated in a set of complaints referencing jobs performed by Defendants for several of the client's insureds. These complaints about the Defendants' business practices in handling jobs for insureds and others were consistent, and egregious. Those making complaints stressed the severity of the situation. Threats were made that lawsuits would be filed against Servpro based upon the Defendants' actions. Servpro was concerned about a loss of business, which would impact the entire franchise system.

10. I made the decision to terminate the franchise. I made the determination that the similarity and numerosity of the complaints reflected materially and unfavorably upon Servpro and the Servpro franchise system.

(Declaration of Randall Isaacson ¶¶ 4-10 (Doc. No. 125-1); *see also* Deposition of Randall Isaacson, at 70, 74-77, 92-93 (Doc. No. 126-1)).

Defendants argue the "Complaint File" is inadmissible hearsay, and may not be considered in ruling on a motion for summary judgment. Rule 56(c)(2) provides that a party may, in connection with a motion for summary judgment, object "that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." When such an objection is made, "[t]he burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." Fed. R. Civ. P. 56(c)(2) advisory committee's note. *See also Mangum v. Repp*, 674 Fed. Appx. 531, 536-37 (6th Cir. 2017); *Thomas*

11

*v. Haslam*, 2018 WL 1702064, at *25-26 (M.D. Tenn. March 26, 2018); *Weldon v. Hale,* 2017 WL 3479622, at *7-8 (S.D. Ohio Aug. 14, 2017).[2] Servpro argues the Complaint File is admissible under multiple hearsay exceptions. First, Servpro contends the File is a business record, admissible under Federal Rule of Evidence 803(6). Rule 803(6) provides:

> (6) Records of a Regularly Conducted Activity. A record of an act, event, condition, opinion, or diagnosis if:
>
> (A) the record was made at or near the time by – or from information transmitted by – someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
>
> (C) making the record was a regular practice of that activity;
>
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
>
> (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6); *see also Cobbins v. Tennessee Dep't of Transp.,* 566 F.3d 582, 588 (6th Cir. 2009); *Peak v. Kubota Tractor Corp.*, 559 Fed. Appx. 517, 522 (6th Cir. 2014).

Servpro relies on the Declaration of Mr. Maas to support admission of the File:

> 2. I am the Deputy General Counsel for Servpro Industries, LLC, formerly known as Servpro Industries, Inc. ('Servpro'). By virtue of my duties and responsibilities, I am familiar with the manner in which the records contained in what has been previously filed with the Court (labeled Docket Entry 126-3) were created and/or maintained by Servpro.

---

[2] Although summary judgment should be based on admissible evidence, the evidence does not necessarily have to be presented in final, admissible form at the motion for summary judgment stage. *See, e.g.*, *Thomas,* 2018 WL 1702064, at *25-26.

12

3. Docket Entry 126-3, which has been referred to in this lawsuit as the 'Complaint File,' is a compilation of documents regarding complaints received by Servpro, either in writing or orally, from customers and insurance companies about the Defendants' former business, Servpro of Rosemead/South El Monte, and some records regarding efforts to investigate and/or resolve some of those complaints.

4. If Servpro receives complaints from customers of a Servpro franchise (homeowners or business owners), insurance companies, or key accounts about a Servpro franchise those complaints are documented.

5. In the latter half of 2017, but prior to the filing of this action, the complaints that Servpro was able to identify at that time were compiled into the Complaint File by the Servpro Legal Department. The complaints contained in the Complaint File were received during the time period that Defendant Delta Dawgs operated as a Servpro franchise.

6. The complaints were compiled in the same nature in which they were received, by email, correspondence, and through Servpro's 'QAP' complaint process. The complaints against the Defendants have not been altered. I understand that the Defendants in one of their recent pleadings has criticized the Complaint File for being 'unorganized;' however, this is the order in which the complaint were compiled for internal use.

7. It is Servpro's regular practice to receive and to make these types of records at or near the time of the receipt of complaints. It is Servpro's regular practice for these types of records to be made by, or from information transmitted by, persons with knowledge of the matters set forth in the records. These records were received or created and were maintained in the course of Servpro's regularly conducted business activity.

(Doc. No. 141-1 ¶¶ 2-7).

As for the statements made in the records themselves, Servpro points out that many of the writings and emails in the Complaint File were responses from Ms. Woloski, and as such, are admissible as admissions of a party opponent under Federal Rule of Evidence 801(d)(2). As for the other statements, Servpro contends they are admissible as recorded recollections under Rule

13

803(5), and as character reputation evidence under Rule 803(21). Defendants have not responded to Servpro's hearsay arguments.[3]

The Court is persuaded that Servpro has met its burden to show that the Complaint File is admissible as a business record.[4] As for any "hearsay within hearsay" statements made by individuals other than Ms. Woloski (which are admissions of a party-opponent) in the File, the Court finds it unnecessary to consider the "truth" of any such statement in order to reach its decision, as more fully discussed below.

Defendants also contest the factual validity of the customer complaints in the Complaint File by citing to Ms. Woloski's Declaration, in which she denies Delta Dawgs engaged in price gouging, overbilling, excessive amounts of demolition, charges for services not performed, intimidation, or other unethical business practices as a Servpro franchisee. (Doc. Nos. 130-12; 129 ¶ 9). Defendants also cite to the deposition testimony of Ms. Woloski, where she disputes the allegations made by five or six of the complainants, as well as the deposition testimony of Mr. Woloski, where he claims that customers were pleased with the work he performed for them, and that their complaints were based on their failure to understand financial issues. (Doc. No. 128-11).

Based on this evidence, Defendants argue Servpro cannot prove they "engaged in conduct" that reflected materially and unfavorably upon Delta Dawgs and Servpro's reputation, as required by Section 10.4(c). According to Defendants "Servpro has offered no admissible evidence that Delta Dawgs actually engaged in the type of conduct that would justify termination of the

_____

[3]   In one of their briefs, Defendants suggest they will file a motion for leave to file a sur-reply to address any hearsay arguments made by Servpro. (Doc. No. 134, at 6). Defendants have not filed such a motion.

[4]   Mr. Maas' Declaration also establishes the Complaint File meets the authenticity requirements of Federal Rule of Evidence 901.

14

Franchise Agreement, and even if it had, such evidence is disputed by Delta Dawgs' denials that it did anything wrong, which are already in the record." (Doc. No. 134, at 2). And given these factual disputes, Defendants argue, summary judgment is improper. Servpro argues, on the other hand, that Section 10.4(c) does not require it to prove the validity of each and every customer complaint before it is permitted to terminate a franchisee.

The Franchise Agreement provides that Tennessee law governs disputes, and the Court has held in a prior Memorandum and Order (Doc. Nos. 119, 120) that the choice of law provision is enforceable. Under Tennessee law, a cardinal rule of contract interpretation is to give effect to the intent of the parties. *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006). The court is to "look to the plain meaning of the words in the document to ascertain the parties' intent." *Id.* The contract is to be interpreted "according to its plain terms as written, and the language used is taken in its 'plain, ordinary, and popular sense.'" *Crye-Leike, Inc. v. Carver*, 415 S.W.3d 808, 816 (Tenn. Ct. App. 2011) (quoting *Bob Parsall Motor, Inc., v. Regal Chrysler – Plymouth, Inc.,* 521 S.W.3d 578, 580 (Tenn. 1975)). Tennessee law also implies a duty of good faith and fair dealing in the performance and enforcement of every contract. *Dick Broad. Co. of Tennessee v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 660 (Tenn. 2013).

Section 10.4(c) permits termination when the franchisee is convicted of certain crimes that the franchisor "believes is likely to have an adverse effect" upon the franchise system, or the franchisee "*otherwise engages in conduct that reflects materially and unfavorably upon [the franchisee] and the reputation of the system*." In the Court's view, the plain meaning of the latter clause permits termination where Servpro determines, in good faith, that a franchisee's conduct – either through the accumulation of customer complaints or the failure to promptly resolve those complaints – has a materially unfavorable effect on Servpro's reputation. Despite Defendants'

15

argument to the contrary, Servpro is not required to first adjudicate that each complainant is correct on every point before making the decision to terminate because damage to a company's reputation does not always depend on the ultimate validity of the complaint. A franchisor is legitimately concerned with customers and members of the public forming opinions about whether it is a "reputable" company based on the number and nature of complaints; the public does not necessarily withhold opinion awaiting an investigation to determine if the franchisee has a viable defense. Thus, a franchisee's failure to promptly resolve complaints, even when the customer is in the wrong, may result in damage to the franchisor's reputation. In other words, at some point, the consistent and serious nature of unresolved consumer complaints can be a legitimate basis for termination if the franchisor can show the complaints resulted in damage to its reputation.

Servpro has satisfied the burden of showing reputational damage here. Mr. Cunho and Mr. Isaacson explained in detail how the consistency of the complaints and the egregious nature of the complaints, along with threatened lawsuits, jeopardized Servpro's relationships with insurers and other key accounts. Mr. Maas testified that the number of serious, detailed customer complaints against Defendants were the most extreme he had seen in his years of franchising, and described Defendants' responses to the complaints as inadequate. This evidence supports a good faith belief on the part of Servpro that the conduct of Defendants – in accumulating customer complaints and/or failing to promptly resolve them – was materially and unfavorably damaging its reputation. *See Humboldt Oil Co., Inc. v. Exxon Co.,* 695 F.2d 386, 388-89 (9th Cir. 1982) (In construing the termination provisions of the Petroleum Marketing Practices Act, the court held that "good faith belief of the franchisor that the franchisee is untrustworthy or engages in fraudulent practices

undermines the entire franchise relationship.")[5] Defendants have offered no evidence – from Servpro's major clients or otherwise – indicating Servpro's concern about its reputation was not a valid one. In the absence of such contrary evidence, Servpro is entitled to summary judgment on Defendants' counterclaim for breach of the Franchise Agreement.[6]

## C.  Servpro's Claim for Breach of Section 11.1 of the Franchise Agreement

Servpro is the owner of a number of trademarks and service marks registered with the United States Patent and Trademark Office. (Defendants' Response to Facts ¶ 66). Franchisees are granted a license to use the Marks while operating a Servpro Franchise. (*Id.*) Upon termination, Section 11. 1 of the Franchise Agreement provides, among other things, that a franchisee must immediately cease all use of the trademarks, and de-identify its operations from the Servpro name, including any vehicles, equipment, and advertising materials. (*Id.* ¶¶ 64-65). Specifically, Section 11.1 provides, in part, as follows:

> 11.1  OPERATOR's Obligations Upon Termination, Expiration or Non-Renewal
> This Agreement may be terminated prior to the expiration of its term, as set forth in Article 10. Upon termination, expiration or non-renewal of this Agreement for any reason, whether by reason of lapse of time, default in performance or other cause or contingency, all rights granted under this Agreement shall terminate, and OPERATOR shall:

---

[5]    Without citation to supporting evidence, Defendants suggest Servpro reached its decision without conducting any investigation into the validity of the customer complaints. To the extent Defendants are attempting to argue that Servpro acted in bad faith, they have not cited any evidence in support. Moreover, the Court notes Mr. Isaacson's testimony about the National Accounts team's investigation of the complaints, and the concern expressed by the team that the complaints were jeopardizing Servpro's position and relationship with national account clients. (Isaacson Deposition, at 36, 75-76, 92-93). Mr. Maas also testified that investigations into the complaints were conducted by the National Account managers. (Maas Deposition, at 24, 39, 55-56, 90).

[6]    Servpro alternatively argues that Defendants' alleged application for a ServiceMaster franchise, a competing franchisor, provides an additional and independent basis for termination. Because the Court has found Servpro's initial basis for termination complied with the terms of the Franchise Agreement, it is unnecessary to address this alternative basis.

17

(a) Immediately and permanently remove or change, or cause to be removed or changed, all signage, regardless of location, as FRANCHISOR shall reasonably direct, so as to eliminate FRANCHISOR's identification and to effectively distinguish the Franchise from its former appearance and from any other SERVPRO franchise in the System, including, without limitation, the repainting of all vehicles and equipment;

\* \* \*

(c) Promptly assign and transfer to FRANCHISOR each and every telephone number, directory listing, advertising or website and URL domain name used in connection with the Franchise and sign all documents required by the telephone company or service provider to affect such a transfer and to discontinue all social media usage and electronic and other advertising associated with FRANCHISOR. OPERATOR agrees to pay any indebtedness that any service provider may required to be paid as a condition of transferring the telephone number, directory listing, advertising or website;

(d) Immediately and permanently cease to use, in any manner whatsoever, all Confidential Information, including, without limitation, all confidential and proprietary methods, procedures and techniques associated with the Franchise, and return to FRANCHISOR the complete set of Manuals, and all other manuals, bulletins, all computer software applications, advertising materials, report forms, customer lists, customer files and other materials of a confidential or proprietary nature developed or adopted by FRANCHISOR for use in the System or bearing any of the Proprietary Marks;

(Doc. No. 126-1, at 32).

Servpro contends Defendants breached these provisions by: (1) failing to remove Servpro branding from a vehicle after termination, as required by Section 11.1(a); (2) failing to assign or transfer telephone numbers, as required by Section 11.1(c); (3) failing to discontinue all social media usage and electronic and other advertising, as required by Section 11.1(c); and (4) failing to return all confidential and other materials, as required by Section 11.1(d).

<u>Vehicle.</u>   The parties have presented the following evidence with regard to the Servpro-branded vehicle. Defendants admit they did not remove the Servpro branding from their work vehicle until more than seven months after the termination of the franchise, in or after May 2018.

18

(*Id.* ¶ 68). Defendants also admit that, prior to May 23, 2018, they represented to Servpro that their Servpro-Branded Vehicle was being kept at their business address (9906 Lower Azusa Road, El Monte, California) and was not being used in connection with commercial activities. (*Id.* ¶ 69). On the morning of May 23, 2018, however, private investigator Paul Blaum[7] observed a green Servpro-branded van leaving Delta Dawgs' business address at 9906 Lower Azusa Avenue in El Monte, California. (*Id.* ¶ 72). Several individuals at the Delta Dawgs facility had loaded the green Servpro-branded van with tools and equipment. (*Id.*) Mr. Blaum observed a yellow ServiceMaster-branded pick-up truck depart the Delta Dawgs facility at approximately the same time. (*Id*). Mr. Blaum followed the Servpro-branded van to a residential construction site located at 8962 Reales Street, Rancho Cucamonga, California, and took a picture of the van at the jobsite. (*Id.*)

On May 30, 2018, Mr. Blaum observed the same green Servpro-branded van and the same yellow ServiceMaster-branded pickup leaving the Delta Dawgs' business address at 9906 Lower Azusa Avenue in El Monte, California. (*Id.* ¶ 73). Both vehicles were photographed later that day at the same jobsite. (*Id.*) Mr. Blaum's photos show the Servpro and ServiceMaster vehicles parked next to each other. (*Id.*). Defendants used the Servpro-branded vehicle on the streets of the greater Los Angeles area after being terminated on November 1, 2017. (*Id.*).

Despite these admissions, Defendants state that, when Mr. Blaum took the referenced photos, the van was parked at a construction site where Mr. Woloski was building a house for Ms. Woloski. (Declaration of Paul Woloski ¶ 1 (Doc. No. 138)). Mr. Woloski states he was delivering

---

[7]  Servpro attached to its Requests for Admission to the Defendants a copy of the Declaration of California private investigator Paul Blaum. (*Id.* ¶ 70).

19

tools and equipment to the site, and that there was no remediation or mitigation activity occurring there. (*Id.*) Defendants rely on this statement in arguing that they did not violate Section 11.1(a), apparently asserting that Section 11.1 applies only if the Servpro-branded vehicle is being "used" for remediation or mitigation activity.

The Court is not persuaded Defendants' narrow construction is supported by the plain language of Section 11.1(a). The requirement that the franchisee "immediately and permanently . . . remove all signage" is not dependent on the "use" being made of the vehicle. Defendants' admission that they failed to remove Servpro branding from the vehicle for more than seven months after termination entitles Servpro to summary judgment on this claim. The nature of any requested relief as a result of the breach will be determined in a later proceeding.

<u>Telephone and facsimile numbers.</u>   Servpro contends that, while operating as a Servpro franchise, Defendants used the telephone number (626) 350-3166 and the facsimile number (626)350-3066, and that these numbers were not assigned or transferred after termination as required by Section 11.1(c). In response, Defendants state only that the facsimile number (626) 350-3066 was not used as part of the Servpro franchise. (Defendants' Response to Facts, ¶ 74). Defendants do not deny the other telephone number was used as part of the Servpro franchise, or that they failed to transfer the number upon termination. (*Id.*)[8] Thus, Defendants are deemed to have admitted that fact. *See* Local Rule 56.01(f). Their admission entitles Servpro to summary

--------

[8]    Defendant Tammy Woloski states in one of three declarations filed in connection with the pending motions that the telephone number (626) 350-3166 was used for 20 years "prior to becoming a Servpro franchise." (Declaration of Tammy Woloski, ¶ 8 (Doc. No. 129)). She does not deny it was used in connection with the Servpro franchise. As for the other number, Ms. Woloski states: "[t]he phone number (626) 350-3066 is an internet, wireless number that was not used in operation of the Delta Dawgs Servpro franchise." (*Id.*)

judgment on the breach of contract claim regarding failure to transfer telephone number (626) 350-3166, as required by Section 11.1(c). The nature of any requested relief as a result of the breach will be determined in a later proceeding. Genuine issues of disputed fact preclude summary judgment regarding failure to assign or transfer telephone or facsimile number (626) 350-3066.

Social media and electronic advertising. Servpro contends that Defendants also violated Section 11.1(c) by failing to "discontinue all social media usage and electronic and other advertising" associated with Servpro. According to Servpro, as of April 2019, "Servpro of Rosemead" was listed on Yelp, Houzz, and Yahoo using the telephone number associated with the former franchise, and Yelp and Houzz showed the entry as of December 3, 2019. Defendants dispute that allegation. (Defendants' Response to Facts ¶ 75; *see also* Servpro's Response to Defendants' Statement of Additional Material Facts ¶¶ 1-4 (Doc. No. 142)). In support, Defendants rely on the Supplemental Declaration of Tammy Woloski, through which Ms. Woloski denies the defendants ordered or placed advertisements on Yelp, Yahoo, or Houzz. (Doc. No. 136 ¶ 1). Ms. Woloski also describes her efforts to cancel the entries. (*Id.* ¶¶ 2-5). Given these disputed issues of material fact regarding social media usage and electronic advertising, summary judgment is denied on this claimed violation of Section 11.1(c).

Return of confidential information and materials. Servpro argues Defendants violated Section 11.1(d) of the Franchise Agreement by failing to "immediately and permanently" cease use of all Confidential Information (as defined by the Franchise Agreement) and return to Servpro the materials listed in Section 11.1(d). Defendants admit they have not returned a complete set of manuals and other Servpro materials and property, but deny they still have possession of the manuals. (Defendants' Response to Facts ¶ 78). Defendants' admission they failed to comply with Section 11.1(d) entitles Servpro to summary judgment on this claim. The nature of any requested

21

relief, and the issue of whether Defendants will be able to comply with a potential injunction ordering return of the materials, may be considered in a later proceeding.

**D. Servpro's Claim for Breach of Section 6.6 of the Franchise Agreement**

Defendants seek summary judgment on Servpro's claim that they breached Section 6.6 of the Franchise Agreement, which contains non-competition provisions. As noted above, Servpro did not address this claim in its initial brief, but responds to Defendants' arguments on the issue in subsequent briefs.

Section 6.6 provides, in pertinent part, as follows:

6.6     In-Term and Post-Term Covenants.  OPERATOR specifically acknowledges that, pursuant to this Agreement, OPERATOR will receive valuable training, trade secrets, proprietary or Confidential Information, including, without limitation, information regarding the operational, sales, promotional and marketing methods and techniques of FRANCHISOR and the System which are beyond the present skills and experience possessed by OPERATOR and OPERATOR's Owners and employees. OPERATOR acknowledges that such training, trade secrets, proprietary or Confidential Information provides OPERATOR a competitive advantage and will be valuable to OPERATOR in the development of the Franchise and, further, that gaining access to such training and information is a primary reason why OPERATOR is entering into this Agreement. In consideration for receipt of such training and information, except as otherwise pre-approved in writing by FRANCHISOR, OPERATOR covenants on behalf of OPERATOR, its Owners and their spouses and domestic partners, and key employees that OPERATOR, its Owners and their spouses and domestic partners and key employees shall **not**, directly or indirectly, through or on behalf of or in conjunction with any person or legal entity, as an agent, employee, principal, partner, director, officer, shareholder or in any other individual or representative capacity, in any legal entity:

\* \* \*

(b)     Own, maintain, operate, engage or participate in, profit from, either directly or indirectly, or conspire with or encourage others to do so, or have any financial interest in, a business that engages in any business that is the same or similar to the Franchise, or that provides cleaning, deodorization, damage restoration or services that are the same or similar to the Franchise, or is otherwise competitive with the business of FRANCHISOR, other SERVPRO franchisees, DISTRIBUTORS, located:

(1)   anywhere during the term of this Agreement;

22

(2) in the Operating Territory and a twenty-five (25) mile radius of the exterior boundaries thereof, for a continuous, uninterrupted two (2) year period, commencing upon the earlier of: (i) the termination of this Agreement, whether by lapse of time, default in performance or other cause or contingency; or (ii) the time such individual or entity ceases to have any ownership or other beneficial interest in the Franchise or OPERATOR, which period shall be extended by any period of noncompliance with this covenant . . .

(Doc. No. 126-1, at 20-21, ¶ 6.6).

Defendants raise a number of arguments that Section 6.6 does not apply, or is unenforceable. First, Defendants argue that Section 6.6 is only enforceable against Delta Dawgs, and the actions Servpro claims were violative of this provision were taken by the Woloskis and not on behalf of Delta Dawgs. Because the Woloskis are not bound by Section 6.6, Defendants argue, Servpro cannot maintain its claim for breach of the provision. In response, Servpro points to the language of the Guaranty Agreement, signed by the Woloskis individually, which states: "Guarantor [Tammy and Paul Woloski] shall be liable and obligated under any such Franchise Agreement to the full extent of its terms in his or her individual capacity." (Doc. No. 126-1, at 107, ¶ 1). Defendants have not responded to this argument. Given the language of the Guaranty, the Court concludes the Woloskis were bound by Section 6.6.

Defendants argue Section 6.6 is unenforceable because it contravenes California law. As noted above, in a prior Memorandum and Order (Doc. Nos. 119, 120), the Court determined that the Tennessee choice-of-law provision in the parties' agreements should be enforced. (Doc. No. 119, at 2-5). As a result, the Court dismissed Defendants' stand-alone counterclaims alleging violations of California law. The Court left open the possibility, however, that Defendants could argue certain provisions of California law were incorporated into the Franchise Agreement, and

thus, any failure to apply those provisions could be part of their breach of contract claim. (Doc. No. 119, at 5).

Defendants now attempt to use this incorporation theory to argue that Section 16600 of the California Business and Professional Code has been incorporated into the Franchise Agreement, and that application of Section 16600 renders the non-competition clause of Section 6.6 unenforceable.[9] Defendants contend the statute is incorporated through operation of Section 6.6 of the "California Addendum" to the Franchise Agreement, as well as Items 9 and 17 of the "Franchise Disclosure Document" ("FDD"). The introductory language and Section 6.6 of the "California Addendum" state:

> This Addendum to Franchise License Agreement is made in recognition of the requirements of the California Business and Professions Code Sections 20000 to 20043. The parties to the attached Servpro Industries, Inc. Franchise License Agreement (the 'Agreement') agree as follows:
>
> * * *
>
> 3.    Section 6.6, <u>In-Term and Post-Term Covenants,</u> subsection (b)(2) is amended by adding: The Agreement contains a covenant not to compete which extends beyond the termination of the Franchise. This provision may be unenforceable under California law.

(Doc. No. 126-1, at 44). Items 9 and 17 of the FDD[10] have similar language. Item 9 states, in a footnote, that "[a] covenant not to compete which extends beyond termination of the Franchise

---

[9]    Section 16600 states: "Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." The Court notes that, in a decision issued on August 3, 2020, the California Supreme Court held that Section 16600 does not render all such restraints on business dealings void *per se*; rather a "rule of reason" applies to such restraints. *Ixchel Pharma, LLC v. Biogen, Inc.*, ___ P.3d ___, 9 Cal.5th 1130, *10-11 (2020). Defendants have not addressed this decision in their briefs.

[10]    Defendants have not attempted to establish that the FDD is part of the Franchise Agreement. The Court notes that the first page of the FDD states:

may not be enforceable under California Bus. And Prof. Code § 16,600." (Doc. No. 130-9, at 40). Item 17 states that, under the choice-of-law provision, "Tennessee law applies unless local state law supersedes this provision." (Doc. No. 130-9, at 71).

None of these provisions state that Section 16600 is incorporated into the Franchise Agreement. They merely advise the franchisee that Section 16600 may be contrary to the terms of the contract they are signing.[11] The Court views these statements as efforts to ensure the franchisee has made an informed decision about whether to enter into the franchise relationship. *See, e.g. A Love of Food I, LLC v. Maoz Vegetarian USA, Inc.,* 70 F. Supp. 3d 376, 382-83 (D.D.C. 2014) (discussing federal and state disclosure statutes designed to ensure potential franchisees make informed decisions when entering into a franchise relationship). Indeed, it would make little sense

---

This disclosure document summarizes certain provisions of your franchise agreement and other information in plain English. Read this disclosure document and all accompanying agreements carefully. You must receive this disclosure document at least 14 calendar days before you sign a binding agreement with, or make any payment to the franchisor or an affiliate in connection with the proposed franchise sale . . .

* * *

*The terms of your contract will govern your franchise relationship.* Don't rely on the disclosure document alone to understand your contract. Read all of your contract carefully. Show your contract and this disclosure document to an advisor, like a lawyer or accountant.

(Doc. No. 130-9, at 2) (emphasis added).

[11] By contrast, the language used by the parties in Section 1 of the Addendum indicates certain provisions of California law "will control" in the event of inconsistencies with the "Renewal" and "Default and Termination" provisions:

1. Section 1.2, Renewal, and Section 10, Default and Termination, are amended by adding: California Business and Professions Code Sections 20000 to 20043 provide rights to OPERATOR concerning termination or non-renewal of a Franchise and further provide if the Agreement is inconsistent with California law, California law will control.

(Doc. No. 126-1, at 44).

25

to include a non-competition provision in a contract, and then, through an addendum, incorporate a provision of local law arguably rendering the provision unenforceable. And there is no indication in the plain language of the contract that the parties intended such a result. *See Crye-Leike, Inc. v. Carver*, 415 S.W.3d at 816 (explaining that a contract is to be interpreted "according to its plain terms as written, and the language used is taken in its 'plain, ordinary, and popular sense.'")

Next, relying on *Nagrampa v. MailCoups, Inc.,* 469 F.3d 1257 (9th Cir. 2006), Defendants argue that Section 6.6 is unenforceable because there was no "meeting of the minds" between the parties regarding whether Servpro would enforce the provision. In *Nagrampa v. MailCoups, Inc.,* the court concluded that a provision in a franchise agreement providing for arbitration in Boston, Massachusetts, was unconscionable and unenforceable under California law. The provision at issue provided: "The franchise agreement requires binding arbitration. The arbitration will occur at the offices of the American Arbitration Association nearest our home office [Boston]. This provision may not be enforceable under California law." 469 F.3d at 1291. The court reasoned that the franchisee did not "reasonably expect" the provision would be enforced given its "misleading" language and the franchisor's decision to file suit in California instead of Massachusetts. 469 F.3d at 1290-91.

Defendants contend the California Addendum of the Franchise Agreement in this case also contains "misleading language" by stating that Section 6.6 "may be unenforceable under California law." That confusion, Defendants argue, prevented the parties from reaching a "meeting of the minds." In Tennessee, the courts consider the conduct of the parties and the attendant circumstances in determining whether a "meeting of the minds" has occurred:

> 'Under general principles of contract law, a contract must result from a meeting of the minds of the parties in mutual assent to the terms.' *Sweeten v. Trade Envelopes, Inc.,* 938 S.W.2d 383, 386 (Tenn.1996) (citation omitted). '[T]he meeting of

26

the minds ... [is] to be determined ... not alone from the words used, but also the situation, acts, and the conduct of the parties, and the attendant circumstances.' *Huestis,* 237 S.W.2d at 675. 'Courts determine mutuality of assent by assessing the parties' manifestations according to an objective standard.' *Id.* at 674. Whether a meeting of the minds occurred is a question of fact. 17B C.J.S. *Contracts* § 1008 (2012).

*In re Estate of Josephson*, 2012 WL 3984613, at *2 (Tenn. Ct. App. Sept. 11, 2012); *see also Moody Realty Co., Inc. v. Huestis,* 237 S.W.3d 666, 674-75 (Tenn. 2007). Defendants do not cite any cases applying Tennessee law that suggest the language used in the parties' California Addendum precluded a "meeting of the minds" as to Section 6.6 (which plainly states that the franchisee agrees to certain non-competition activities). As discussed above, the Court views the purpose of the Addendum as ensuring the franchisee is *not* misled; by disclosing the terms that may be contrary to the law that may otherwise apply. The *Nagrampa* decision, applying California law, does not persuade the Court otherwise.

Even if Section 6.6 is enforceable, Defendants argue, Servpro has not shown they breached the provision either before or after termination of the Franchise Agreement. Servpro argues, in response, that the evidence demonstrates the Woloskis' activities regarding ServiceMaster violate both the "in-term" and the "post-termination" non-competition provisions.

The parties agree that ServiceMaster is a direct competitor of Servpro. (Defendants' Response to Facts ¶ 31). Defendants also agree that Tammy Woloski contacted ServiceMaster in April 2017, about obtaining a ServiceMaster franchise, and that ServiceMaster conducted an onsite visit with Ms. Woloski on June 7, 2017. (*Id.* ¶ 36). Defendants contend, however, that Ms. Woloski was merely helping her brother Jun Gong (a/k/a John Gong) in obtaining the franchise, through his company, Express Restoration Corporation, because he is not fluent in English. In that regard, Mr. Gong states in his Declaration that he is the sole owner of Express Restoration, and Ms.

27

Woloski simply aided him in obtaining the franchise. (Declaration of Jun Gong (Doc. No. 137)). Ms. Woloski has also filed a Declaration indicating that she told ServiceMaster representatives that her brother was the person buying the franchise. (Second Supplemental Declaration of Tammy Woloski (Doc. No. 139)).

On the other hand, Servpro relies on notes taken by a ServiceMaster representative about his conversations with Ms. Woloski, and those notes reflect that Ms. Woloski described her intention to operate the franchise. (Doc. No. 126-5, at 3-4, 7-8). Ms. Woloski denies she made those statements. (Doc. No. 139). Servpro has also filed a copy of the ServiceMaster franchise application, which is undated, as well as the ServiceMaster franchise agreement, which is dated June 16, 2017. (Doc. No. 126-5, at 10-53). Both are in the name of Express Restoration Corporation, and the signature of the company's representative is illegible. (*Id.*) Under "Business Ownership Structure," however, the application states that "Jing Gong" owns 100% of Express Restoration. (Doc. No. 126-5, at 10). Under "Personal Information – Applicant Name" is "JING GONG AKA TAMMY WOLOSKI" with the following email address: "tammymailbox@aol.com." (*Id.*) Under the "Personal Financial Statement" portion of the application, an office building located at 9906 Lower Azusa Road, El Monte, California, the address for Delta Dawgs, is listed. (Doc. No. 126-5, at 11). Servpro also points out that Ms. Woloski provided to ServiceMaster, in support of the franchise application, a copy of a California contractors' license in the name of Delta Dawgs d/b/a Express Restoration Company, which belongs to Paul Woloski. (Doc. No. 126-5; Defendants' Response to Facts ¶ 43).

Defendants admit as much, but point out that the Franchise Agreement itself lists Jun Gong as 100% owner of Express Restoration. (Defendants' Response to Facts ¶¶ 47, 48, 49; Doc. No.

28

126-5, at 32). Exhibit A to the Agreement, however, provides that "Jing Gong" shall remain as owner of the Franchisee. (*Id.* ¶ 52; Doc. No. 126-5, at 34).

As for post-termination activity, Defendants admit that Ms. Woloski emailed ServiceMaster and asked that Ms. Woloski be added as a 20% owner to the franchise on December 27, 2017. (*Id.* ¶¶ 53-54). To effect the change, Mr. Woloski signed an application stating "Jing Gong" (Mrs. Woloski) was 80% owner of Express Restoration, and that he was 20% owner. (*Id.* ¶ 56; Doc. No. 126-5, at 62-65). Under "Personal Financial Statement," Mr. Woloski also listed the office building located at 9906 Lower Azusa Road, El Monte, California, the address for Delta Dawgs. (Doc. No. 126-5, at 63). In January 2018, Mr. and Ms. Woloski attended ServiceMaster training in Memphis, Tennessee. (*Id.* ¶ 58; Jun Gong Declaration ¶ 5). Ms. Woloski's business card for the ServiceMaster franchise shows the same business address as she used for the Servpro franchise. (*Id.* ¶ 59). Defendants admit they performed jobs as a ServiceMaster franchisee between May 2018 and December 2018. (Jun Gong Declaration ¶ 5).

ServiceMaster issued a Notice of Termination letter addressed to Jing Gong (Mrs. Woloski) dated December 18, 2018. (Defendant's Response to Facts ¶ 60). The Notice states the basis for termination is fraud for failing to disclose the Servpro relationship. (*Id.*) Defendants did not at any time disclose to Servpro that any of them owned or had an interest in a ServiceMaster franchise. (*Id.* ¶ 63). On November 30, 2018, Servpro sent Delta Dawgs a Supplement to the original Notice of Termination, citing the ServiceMaster franchise as a separate and independent basis for termination. (*Id.* ¶ 33; Doc. No. 126-6, at 2-4).

As for the post-termination non-competition provision in Section 6.6, the Court concludes the evidence in the record and the admissions by Defendants conclusively establish their breach. Section 6.6(b)(2) prohibits the ownership, operation, or participation in a business that is the same

29

or similar to Servpro's business, in the same operating territory, for a two-year period after termination.[12] As discussed above, Defendants admit ServiceMaster is a direct competitor of Servpro, and that their ServiceMaster franchise address was the same as the one they used for their Servpro franchise. Defendants also admit they executed ServiceMaster franchise documents, attended ServiceMaster training, and performed work as a ServiceMaster franchisee, all within two years after the November 1, 2017 date of the termination of the agreement.

As for their conduct during the term of the agreement, under Section 6.6(b)(1), the Court concludes the facts are in dispute. As described above, there are entries in the ServiceMaster documentation that can be read to support either side. Ms. Woloski and her brother, Jun Gong, have provided sworn testimony that Ms. Woloski's interactions with ServiceMaster prior to November 2017, was on behalf of Mr. Gong, and the Court is not permitted to weigh the credibility of these declarants at the summary judgment stage. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255.

As noted above, Servpro has not moved for summary judgment regarding Section 6.6. Although Defendants have moved for summary judgment on this claim, a genuine factual dispute precludes summary judgment on their pre-termination conduct, and Defendants have failed to establish they are entitled to summary judgment as a matter of law on their post-termination conduct.[13]

---

[12]   Despite Defendants' argument to the contrary, Section 6.6 does not require that the *remediation jobs* they performed on behalf of ServiceMaster take place within 25 miles of Delta Dawgs' Servpro territory.

[13]    Defendants also argue that, even if they are found to have violated the non-competition provisions, Servpro has failed to establish it suffered any monetary damage as a result. In response, Servpro states that it is seeking injunctive relief, not monetary damages, for Defendants' breach. (Doc. No. 132, at 23).  Thus, it is unnecessary to address Defendants' argument about damages.

30

**D.  Servpro's Claim for Breach of the Franchise Agreement by Failing to Pay Royalties**

Although Servpro does not seek summary judgment on Defendants' alleged failure to pay royalties and other fees, Defendants argue they are entitled to summary judgment on this claim. The evidence in the record, however, reveals genuine issues of material fact preclude summary judgment. For example, Defendants contend a Servpro audit reveals they owed only $1,281.12 in royalties and other fees, and that they have paid that amount. (Declaration of Tammy Woloski ¶¶ 1-4 (Doc. No. 129)). By contrast, Servpro's Internal Audit Manager estimates Defendants owe over $100,000 in royalty payments and other fees. (Declaration of James O'Connor ¶¶ 1-18 (Doc. No. 133-5)). Given these disputed material facts, summary judgment is not appropriate on this claim.

**E.  Servpro's Claim for Breach of the Guaranty Agreement**

Servpro contends the Guaranty Agreement requires the Woloskis to ensure Delta Dawgs' timely performance of its obligations under the Franchise Agreement. Defendants do not specifically address this claim. (Defendants' Response to Facts ¶¶ 3, 7). The Guaranty Agreement provides that the Woloskis guarantee Delta Dawgs' performance under the Franchise Agreement. (Doc. No. 126-1, at 106-11). Therefore, because the Court has determined Delta Dawgs has breached certain obligations of the Franchise Agreement, as described herein, the Woloskis have breached the Guaranty Agreement. The nature of any requested relief as a result of the breach will be determined in a later proceeding.

**F.  The Promissory Note**

Servpro alleges the balance owned on the Secured Promissory Note, signed by the Woloskis and Delta Dawgs on December 28, 2015, remains unpaid, and therefore, Defendants are in breach of the agreement. Defendants do not dispute that the remaining balance remains unpaid.

31

(Defendants' Response to Facts ¶ 78; Doc. No. 128, at 25). As Defendants do not contest they have breached the Secured Promissory Note, Servpro is entitled to summary judgment on this claim. The nature of any requested relief as a result of the breach will be determined in a later proceeding.

### G.  Lanham Act

Servpro alleges Defendants' continued use of their trademarks after termination violates the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a) & (c). In order to prove trademark infringement under Section 1114,[14] the plaintiff must show "(1) that it owns a trademark, (2) that the infringer used the mark in commerce without authorization, and (3) that the use of the alleged infringing trademark 'is likely to cause confusion among consumers regarding the origin of the goods offered by the parties.'" *Coach, Inc. v. Goodfellow*, 717 F.3d 498, 502 (6th Cir. 2013) (quoting *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.,* 502 F.3d 504, 515 (6th Cir.2007)).

Section 1125(a),[15] "'is designed to reach, among other things, attempts to appropriate the goodwill associated with a competitor's trademark by means of confusingly similar marking and

---

[14]   Section 1114(1)(a) provides:

Any person who shall, without the consent of the registrant –

 (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . .  shall be liable in a civil action by the registrant for the remedies hereinafter provided.

[15]   Section 1125(a) provides in relevant part:

 (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which –

packaging, which would create an impression that the products of the defendant originated with the plaintiff.'" *Flynn v. AK Peters, Ltd.,* 377 F.3d 13, 19 (1st Cir. 2004 (quoting *Purolator, Inc. v. EFRA Distributors, Inc.,* 687 F.2d 554, 561 (1st Cir. 1982)). In determining whether a "likelihood of confusion" has been established, courts are to consider the following factors: (1) the strength of the registrant's mark; (2) relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) the defendant's intent in selecting the mark; and (8) the likelihood of expansion of the product lines using the marks. *AutoZone, Inc. v. Tandy Corp.,* 373 F.3d 786, 792-93 (6th Cir. 2004); *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center,* 109 F.3d 275, 280 (6th Cir. 1997).

In a case involving alleged use of trademarks by a terminated franchisee, the Sixth Circuit has held that, in order to defeat summary judgment on claims under Sections 1114 and 1125, the terminated franchisee must raise a genuine issue of fact as to (1) whether their use of the trademark was without the registered owner's consent; or (2) whether their unauthorized use was likely to cause confusion in the marketplace as to the origin or sponsorship of the product. *U.S. Structures, Inc. v. J.P. Structures, Inc.,* 130 F.3d 1185, 1188-89 (6th Cir. 1997). In reaching its decision, the court observed: "'Common sense compels the conclusion that a strong risk of consumer confusion

---

   (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . .

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

arises when a terminated franchisee continues to use the former franchisor's trademarks.'" 130 F.3d at 1190 (quoting *Burger King Corp. v. Mason,* 710 F.3d 1480, 1492-93 (11th Cir. 1983)).

Servpro argues that Defendants violated these provisions because, after Defendants were terminated as a franchisee, they continued to use their Servpro-branded vehicle for at more than seven months, and continued to use an email address containing the word "Servpro."

Defendants argue they are not liable for trademark infringement as to the vehicle because any use of the Servpro trademarks after termination of the franchise was not "in commerce." Defendants contend their use of the vehicle displaying Servpro's trademarks after termination was for personal tasks and not in connection with business.

Although Defendants do not cite it, the Lanham Act includes a definition of the phrase "use in commerce" as follows:

> The term "use in commerce" means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. For purposes of this chapter, a mark shall be deemed to be in use in commerce—
>
> > (1) on goods when--
> >
> > > (A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and
> > >
> > > (B) the goods are sold or transported in commerce, and
> >
> > (2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services.

15 U.S.C. § 1127.

Based on this definition, a trademark on services is used in commerce when it is "used or displayed in the . . . advertising" of services that are rendered in commerce. As discussed above, Defendants admit they did not remove the Servpro branding from their work vehicle for more than seven months after termination, and that they used the vehicle on the streets of the greater Los Angeles area during that time. By "displaying" the Servpro trademark on the vehicle in such a way, Defendants "advertised" the services they offered, whether or not they actually used the vehicle in connection with revenue-producing work. Thus, the definition of "use in commerce" does not support Defendants' argument, and Defendants have cited no authority limiting application of the Lanham Act in the way they suggest.[16]

As for the email address, Defendants admit that, after receiving the Notice of Termination, they continued using an email account in their business operations that included the name "Servpro" in the address. (Defendants' Response to Facts, ¶ 67). In addition, Defendants admit one of Delta Dawg's employees, Alex, continued to represent the company as affiliated with Servpro. (*Id.*) Defendants do not raise the "commerce" argument regarding the email address.

Based on Defendants' admissions and the undisputed evidence in the record, the Court concludes Defendants used Servpro's trademarks without its consent after termination, and

---

[16]    None of the cases cited by Defendants to support their "commerce" argument address this definition, nor do they involve a terminated franchisee's continued use of the franchisor's trademarks. *See Lyon v. Quality Courts United, Inc.,* 249 F.2d 790, 795 (6th Cir. 1957) (holding that intrastate infringing activity that has a substantial effect on interstate commerce falls within the "in commerce" requirement of the statute); *Gym Door Repairs, Inc. v. Young Equipment Sales, Inc.,* 331 F. Supp. 3d 221, 250-51 (E.D.N.Y. 2018) (holding that repair firms did not create "confusion as to origin" by placing stickers with their logos on partition safety systems manufactured by plaintiffs); *Vanderbilt Univ. v. Scholastic, Inc.,* 382 F. Supp. 3d 734, 751 (M.D. Tenn. 2019) (rejecting defendants' argument that plaintiff's Lanham Act claim should be dismissed because they used Vanderbilt trademarks "in a non-trademark way – that is, in a way that does not identify the source of a product. . . ").

therefore, Servpro is entitled to summary judgment on their Lanham Act claims regarding the vehicle and email address. The nature of any requested relief will be determined in a later proceeding.[17]

## H.  <u>Common Law Trademark Infringement</u>

Defendants seek summary judgment on Servpro's common law trademark infringement claim. As noted above, Servpro did not address this claim in its initial brief, but responds to Defendants' arguments on the issue in subsequent briefs.

Defendants contend they are not liable for common law trademark infringement because they did not "use" the Servpro trademarks for the purpose of rendering any services or advertising any such services. To support their argument, Defendants cite *Men of Measure Clothing, Inc. v. Men of Measure, Inc.,* 710 S.W.2d 43, 47 (Tenn. Ct. App. 1985), and the court's statement that "[t]he ultimate test of infringement is whether the subsequent user's use of the same or similar mark would create a likelihood of confusion among consumers." The court did not elaborate on the meaning of the term "use," but went on to address the likelihood of confusion given the similarity of the marks at issue. *Id.* Defendants have cited no other Tennessee authority on the meaning of "use," and certainly none that state a service trademark can be infringed only if the user performs revenue-producing activity in connection with that use. *See Murphy v. Lazarev,* 653 Fed. Appx 377, 378 (6th Cir. 2016) ("It is not sufficient for a party to mention a possible argument in [a] skeletal way, leaving the court to put flesh on its bones.")  Accordingly, Defendants have

---

[17]   Defendants argue Servpro must show the public was "actually deceived" in order to recover monetary damages. (Doc. No. 128, at 11). The Court need not address the argument because Servpro is not seeking monetary damages on the Lanham Act claim. (Doc. No. 132, at 8).

not shown they are entitled to summary judgment *as a matter of law* on Servpro's common law trademark infringement claim.[18]

As discussed above, Tammy Woloski, individually, has asserted a counterclaim alleging that Servpro and Richard Connor violated 42 U.S.C. § 1981 by intentionally discriminating against Delta Dawgs during the parties' business relationship based on Ms. Woloski's race and Asian ethnicity. Both sides seek summary judgment on this claim.

The Sixth Circuit has set forth the elements of a Section 1981 claim, in a non-employment context, as follows:

> (1) plaintiff is a member of a protected class; (2) plaintiff sought to make or enforce a contract for services ordinarily provided by the defendant; and (3) plaintiff was denied the right to enter into or enjoy the benefits or privileges of the contractual relationship in that (a) plaintiff was deprived of services while similarly situated persons outside the protected class were not and/or (b) plaintiff received services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory.

*Briscoe v. Jackson,* 285 Fed. Appx. 205, 208 (6th Cir. 2008). In a recent case, the Supreme Court made clear that a Section 1981 plaintiff bears the burden of proving race was the "but-for" cause of his or her injury. *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media,* ___ U.S. ___, 140 S. Ct. 1009, 206 L. Ed. 2d 356 (2020).

The counterclaim alleges Servpro discriminated against Ms. Woloski in the following ways: (1) by forcing Delta Dawgs to overpay for Servpro equipment items; (2) by forcing Delta Dawgs to execute the Promissory Note to secure a loan for a Servpro work vehicle; (3) by

---

[18]    Defendants also argue Servpro is required to establish it has suffered monetary damages in order to establish its common law trademark infringement claim. Servpro appears to represent that it is seeking only injunctive relief as a remedy for this claim (Doc. No. 132, at 8-9). Thus, the Court finds it unnecessary to address Defendants' argument regarding monetary damages at this time.

purporting to grant an exception to the Franchise Agreement's territorial policy, although Delta Dawgs already had an office location within its prescribed territory; (4) by wrongfully advising Delta Dawgs that it could return to the National Accounts Participation program after Delta Dawgs' decision to temporarily leave the program; and (5) by extorting Delta Dawgs for 'under the table' shakedown payments unrelated to Delta Dawgs' payment obligations under the Franchise Agreement and Promissory Note by way of threats of termination. (Doc. No. 83 ¶¶ 89, 90).

In responding to Servpro's Statement of Undisputed Material Facts, Defendants largely admit that they have no evidence to support these allegations. Specifically, Defendants fail to provide evidence they were "forced" to buy Servpro equipment, and admit Ms. Woloski made the decision to buy the Servpro equipment package. (Defendants' Response to Facts ¶¶ 80-91). In addition, Defendants admit there is no evidence they were forced to execute the Promissory Note to secure a loan to purchase a Servpro work vehicle. (*Id.* ¶¶ 92-97). Indeed, Defendants admit Ms. Woloski even considered purchasing a second vehicle. (*Id.*) Defendants admit Servpro granted them an exception to the Franchise Agreement's territorial policy, and do not explain how the grant of such an exception was in any way detrimental to them. (*Id.* ¶¶ 99-100). Defendants also admit they were not given incorrect advice with regard to participation in the National Account program. (*Id.* ¶ 101-02). Finally, Defendants admit there is no evidence in the record Servpro extorted "shakedown payments" from them. (*Id.* ¶¶ 105-06). More generally, Defendants admit they have not identified any similarly-situated franchisees about which Servpro received complaints similar to those received about Defendants that were not also terminated from the Servpro system with notice and without opportunity to cure. (*Id.* ¶ 109).

The only evidence offered by Defendants in support of their Section 1981 claim is the following statement made by Ms. Woloski's in her deposition: "Like Ricky Connor said, 'for people like you, who do not speak English, you should go back to China.'" (Doc. No. 134-2, at 331). Defendants have filed only the page of the deposition on which this statement appears. They have not filed the page on which the question eliciting the statement appears. In that regard, the Court notes that Servpro has filed the deposition testimony of Mr. Woloski, who testified the comment was allegedly made to him when Ms. Woloski was not present. (Doc. No. 142-4, at 131, 138). In any event, for purposes of summary judgment, the Court will assume Mr. Connor made the statement to Ms. Woloski.[21]

Defendants argue in their brief that Mr. Connor's alleged statement creates a triable issue as to whether "racial and national origin animus [was] a factor in the decision to terminate the franchise." (Doc. No. 134, at 14). Defendants have not cited any evidence in the record, however, relating to Mr. Connor's position with Servpro, or that in such a position, he had input into the decision to terminate the franchise. Nor have Defendants attempted to show that Mr. Connor's alleged racial animus was the "*but-for*" *cause* of their termination.[22] Mr. Isaacson has stated he made the ultimate decision to terminate the Delta Dawgs franchise, and that Ms. Woloski's race

--------

[21] Apparently, neither party has filed a declaration or deposition from Mr. Connor.

[22] Defendants state the following in their brief *without any citation to the record*: "The evidence establishes that Conner was the Western Regional Manager of Servpro who had direct management oversight over the Defendant franchise and the Woloskis. Moreover, Conner was heavily involved in the termination process by providing reports and information about the Defendants to the president of the company Mr. Isaacson, who according to his testimony made the ultimate termination decision." (Doc. No. 134, at 14). In another brief, again without citation to the record, Defendants state: "The evidence before the Court is that although Mr. Isaacson made the decision to terminate, he did so in reliance on input from Conner." (Doc. No. 145, at 3).

and/or ethnicity had nothing to do with it. (Doc. No. 126-1, at 88; Doc. No. 125-1 ¶ 12). The parties have filed well over 1,000 pages of evidence to support their respective motions, and if any evidence exists to support Defendants' claim that Mr. Connor had input into the termination decision, the Court is not obliged to "scour the record" to find it. *See, e.g., Shorts v. Bartholomew*, 255 Fed. Appx. 46, 50 (6th Cir. 2007) ("[W]e need not scour the record or make a case for a party who has failed to do so on his own behalf . . . "). By failing to cite factual support, Defendants have failed to satisfy their burden of providing evidence, beyond the pleadings, upon which a reasonable jury could return a verdict in their favor on the Section 1981 claim. *See Celotex Corp.*, 477 U.S. at 324; *Shreve,* 743 F.3d at 132. Thus, Servpro and Counterclaim Defendant Connor are entitled to summary judgment on this claim.

## IV.  CONCLUSION

 For the reasons set forth above, Plaintiff/Counterclaim Defendants' Motion for Summary Judgment (Doc. No. 123) is **GRANTED** in part, and **DENIED** in part; and Defendants' Motion for Summary Judgment (Doc. No. 127) is **GRANTED** in part, and **DENIED** in part.

Servpro is granted summary judgment on the following claims: (1) Defendants' breach of contract counterclaim based on Servpro's termination of the Franchise Agreement; (2) Servpro's breach of contract claim based on Defendants' alleged breaches of the Franchise Agreement by (a) failure to de-identify vehicles and equipment; (b) failure to transfer telephone number (626)350-3166; and (c) failure to return materials; (3) Servpro's breach of contract claim based on the Guaranty Agreement; (4) Servpro's breach of contract claim based on the Promissory Note; and (5) Servpro's trademark infringement claim under the Lanham Act. The nature of any requested monetary and/or injunctive relief will be considered in a later proceeding. Servpro and

Counterclaim Defendant Connor are granted summary judgment on Defendants' counterclaim based on 42 U.S.C. § 1981.

The following claims by Servpro remain: (1) breach of Section 6.6 of the Franchise Agreement for failure to comply with the non-competition provisions; (2) breach of Section 11.1 of the Franchise Agreement for failure to transfer telephone or facsimile number (626)350-3066, and for failure to discontinue social media usage and electronic advertising; (3) breach of the Franchise Agreement for failure to pay royalties and other fees; and (4) common law trademark infringement.

An appropriate Order shall enter.

WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE

41